**Web Pages Cited in the Opinion**

A-570-888
AR: 8/1/2005 – 7/31/2006
**Public Document**
IA/Office 9: BW/MQ

**DATE:**                 March 10, 2008

**MEMORANDUM TO:**     David M. Spooner
                               Assistant Secretary
                                for Import Administration

**FROM:**               Stephen J. Claeys
                               Deputy Assistant Secretary
                                for Import Administration

**SUBJECT:**          Issues and Decision Memorandum for the Final Results in the
                               Second Administrative Review of Floor-standing, Metal-top
                               Ironing Tables and Certain Parts Thereof from the People's
                               Republic of China

**SUMMARY:**

We have analyzed the Brief and rebuttal Brief of interested parties in the second administrative review of floor-standing, metal-top ironing tables and certain parts thereof ("ironing tables") from the People's Republic of China ("PRC").  As a result of our analysis, we have made certain changes from the preliminary results.  *See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review*, 72 FR 51781 (September 11, 2007) ("*Preliminary Results*").  We recommend that you approve the positions described in the "Discussion of the Issues" section of this Issues and Decision Memorandum.  Below is the complete list of the issues in this administrative review:

**General Issues**

Comment 1:    Selection of Appropriate Surrogate Financial Statements
Comment 2:    Appropriate Allocation of "Carriage Inward" Expense
Comment 3:    Application of Benchmark Analysis
Comment 4:    Appropriate Surrogate Value for Plywood

**Background**

We published the preliminary results of the first administrative review in the *Federal Register* on September 11, 2007.  *See Preliminary Results*.  The period of review ("POR") is August 1, 2005, through July 31, 2006.  On October 11, 2007, the Department received one case brief from the petitioner, Home Products International Inc., and one case brief from respondent Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware").  On October 16, 2007, the Department received a rebuttal brief from the petitioner and from Since Hardware.

**DISCUSSION OF THE ISSUES:**

**Comment 1:   Selection of Appropriate Financial Statements**

In the preliminary results, the Department employed the 2004–2005 Infiniti Modules Pvt. Ltd., ("Infiniti Modules") financial statements to value surrogate financial ratios.  In its October 11, 2007, case brief,[1] petitioner argues that the Department should employ the 2005–2006 Infiniti Modules financial statements because the absence of the profit and loss statement ("P&L") from these financial statements does not render the financial statements less reliable than the non-contemporaneous 2004–2005 Infiniti Modules financial statements, which includes the P&L statement.

Petitioner argues that the more POR contemporaneous 2005–2006 Infiniti Modules financial statements contain all the information necessary for the Department's purposes in deriving the surrogate financial ratios.  Petitioner further argues that while comtemporaneity alone is not dispositive, in previous cases the Department has placed a particular emphasis on the significance of the contemporaneity of its sources for surrogate financial ratios.  *See Fresh Garlic From the People's Republic of China*, 67 FR 72139 (December 4, 2002), and accompanying Issues and Decision Memorandum at Comment 6.  Furthermore, petitioner argues that, notwithstanding the relative contemporaneity of the 2005–2006 financial statements, in terms of specificity, the Department has previously deemed Infiniti Modules to be a producer of comparable merchandise, and should continue to find so here.

Petitioner argues that, for the Department's purposes, the lack of the P&L statement from the 2005–2006 Infiniti Modules financial statements does not render the source to be deficient or incomplete, nor does it detract from the reliability of the data contained in the statement.  *See* HPI Case Brief at 3–6.  Specifically, petitioner argues that, notwithstanding the absence of the P&L statement, the Department can calculate the surrogate financial ratios based on the 2005–

---

[1] *See* October 11, 2007, letter from Frederick L. Ikenson of Blank Rome, representing Home Products International, Inc. ("HPI"), to the Department of Commerce, regarding Floor-standing, Metal-top Ironing Tables and Parts Thereof from the People's Republic of China: Case Brief of Home Products International, Inc. ("HPI Case Brief").

2006 Infiniti Modules financial statements in the precise format and following the same methodology utilized by the Department in the preceding administrative review.

Petitioner argues that, according to 19 CFR 351.408(c)(4), the Department is not limited to using annual reports or audited financial statements, and when necessary has previously used broad composite data from such sources as the *October 2003 Reserve Bank of India Bulletin*.[2] Petitioner argues that the Department chooses its source based on the availability, sufficiency, and reliability of the data.  With respect to the Infiniti Modules financial statements, petitioner argues that, in its July 27, 2007, submission to the Department regarding the valuation of factors of production, petitioners demonstrated that all the necessary costs and expenses relevant to the Department in calculating the surrogate financial ratios are available from the Infiniti Modules statement schedules.  Petitioner notes that the Department only relies on a single value from the P&L statements in deriving the surrogate financial ratios, the "profit before tax figure." Petitioner notes that this figure is found in the Director's Report and the Balance Sheet Abstract and the Company's General Business Profile, which is signed by the auditor and company directors.  Thus, petitioner concludes that there is no material shortcoming in the 2005–2006 financial statements.

Furthermore, petitioner argues that aside from the P&L statement, there is no qualitative difference between the 2004–2005 and 2005–2006 Infiniti Modules financial statements. Petitioner argues that the auditor's report confirms that the auditors have fully examined the source documentation, and therefore the data contained in the financial statement schedules are valid.  Petitioner asserts that by filing its financial statement with the Indian Registrar of Companies, the Board of Directors for Infiniti Modules were required, by subsection 215 of the Companies Act, to authenticate the veracity of every page of the financial statements, including the P&L statement, with a signature on behalf of the Board of Directors, prior to the company's submission to auditors.  Petitioner argues that the schedules have been audited and are thus reliable, and therefore, the Department may reliably use the necessary information contained on the schedules to derive the surrogate financial ratios.

Petitioner argues that the 2005–2006 financial statements are not "less complete" than the 2004–2005 Infiniti Modules financial statements, as the Department is able to extrapolate all the necessary information from the 2005–2006 statements, and therefore the 2004–2005 statements are not materially "more complete."  Petitioner argues that according to 19 USC 1677b(c)(1) and 19 CFR 351.408(c)(4), the Department is not required to use "complete" information.  Instead, petitioner contends that19 USC 1677b(c)(1) provides a guideline that allows the Department to use sufficient information from publicly available sources.  *See* HPI Case Brief at 7–14.

---

[2] *See, e.g., Notice of Preliminary Determination of Sales at Less Than Fair Value:  Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China*, 69 FR 5127–5132 (February 3, 2007).

Petitioner further argues that, consistent with Indian law,[3] the Indian Registrar of Companies did not release the Infiniti Modules P&L statement, and thus it would be inappropriate for the Department to dismiss the Infiniti Modules financial statements for lacking a P&L statement. *See* HPI Case Brief at 14–15.  Petitioner concludes that because the 2005–2006 Infiniti Modules financial statements provide sufficient detail for the Department to derive adequate surrogate financial ratios, they are the best information on the record of the review.  *See* HPI Case Brief at 16–18.

Petitioner notes that in *Wooden Bedroom Furniture*,[4] the Department used the financial statements of a company, Jayaraja Furniture Group ("Jayaraja"), even though they lacked various sections commonly found in financial statements.  The US Court of International Trade ("CIT") remanded this decision to the Department[5] and petitioner points out that on remand the Department disregarded Jayaraja's financial statements.  The Department rejected Jayaraja's financial statements because they were incomplete and lacked key reports (*e.g.*, schedules and notes).  Petitioner argues that the Department should apply the same standard in the instant review and accept the 2005-2006 Infiniti Modules financial statements because, although they lack a P&L statement, they do not lack key reports.

In the alternative, petitioner argues that, should the Department continue to use the 2004–2005 Infiniti Modules financial statements, the Department should also use the 2004–2005 Agew Steel Private Limited ("Agew Steel") financial statements even though the 2004–2005 statement is missing its P&L statement as well.  Petitioner argues the Department should use the 2004–2005 Agew Steel statements for the same reasons that the Department should apply the incomplete 2005–2006 Infiniti Modules financial statements.  Specifically, petitioner contends, the Department should also use the Agew Steel financial statements because the Department is able to extrapolate all the necessary information from the accompanying sub-schedules to calculate the surrogate financial ratios.  Furthermore, petitioner asserts that Agew Steel is a producer of more comparable merchandise to ironing tables than Infiniti Modules.  *See* HPI Case Brief at 5–6, footnote 1.

---

[3] Petitioner cites to subsection 610 of the Indian Companies Act, which provides that any person may inspect any documents kept by the Registrar of Companies, "save as otherwise provided elsewhere in this act;" and that subsection 220 of the Companies Act provides that, in the case of a private company, which is not a subsidiary of a public company, no person other than a member of the company shall be entitled to inspect or obtain copies of the profit and loss account of the company under subsection 610 of the Companies Act.

[4] *See Wooden Bedroom Furniture from the People's Republic of China*, 69 FR 67313 (November 17, 2004) ("*Wooden Bedroom Furniture*"), and accompanying Issues and Decision Memorandum at Comment 3.

[5] *See Dorbest Ltd. V. United States*, 30 CIT __, Slip Op. 06-160 at 94–95.  Docket No. 260, CIT Consol. Ct. No. 05-00003 (May 25, 2007).

In response to petitioner's argument,[6] Since Hardware argues that, for the final results, the Department should continue to disregard both of Infiniti Modules' financial statements and instead use the complete and contemporaneous Delite Kom Limited ("Delite Kom") financial statements to calculate the Department's surrogate financial ratios. Since Hardware argues that the P&L statement is a critical aspect of any company's financial statements. Furthermore, Since Hardware argues that without a P&L statement, the Department cannot derive reliable surrogate financial ratios because the schedules may not reflect all of the line items contained in the P&L statement.

Since Hardware argues that the fact that the P&L statement was kept confidential indicates that the P&L statement may contain information that is not in the available accounting schedules. Furthermore, in reconstructing the P&L using the schedules, Since Hardware argues that approximated values may contain errors. Since Hardware argues that using the incomplete Infiniti Modules financial statements may introduce error in deriving the Department surrogate financial ratios. *See* Since Hardware Rebuttal Brief at 1–3.

Pursuant to section 773(c)(1) of the Tariff Act of 1930, as amended ("the Act"), Since Hardware argues[7] that the Department should use the 2005–2006 Delite Kom financial statements to calculate the surrogate financial ratios for the final results because they are complete and contemporaneous with the POR.[8] In addition, Since Hardware argues that because all other financial statements on the record of the instant review are incomplete or are lacking quality, the Delite Kom financial statements represent the best available information on the record in terms of quality, specificity, and contemporaneity.

Since Hardware argues that Delite Kom is a producer of merchandise similar to the metal furniture manufactured by Infiniti Modules, and is therefore a manufacturer of comparable merchandise to ironing tables.[9] However, Since Hardware argues that, unlike Infiniti Modules, the primary materials consumed by Delite Kom[10] during manufacturing is cold-rolled steel. As such, Since Hardware concludes that Delite Kom's experience and production processes are more comparable to Since Hardware's production process experience. In addition, Since

---

[6] *See* October 16, 2007, respondent rebuttal brief to the United States Department of Commerce; from Trade Pacific PLLC on behalf of Since Hardware (Guangzhou) Co., Ltd.; regarding Floor Standing Metal-top Ironing Tables from the People's Republic of China ("Since Hardware Rebuttal Brief").

[7] *See* October 11, 2007, letter to the United States Department of Commerce, from Trade Pacific PLLC on behalf of Since Hardware (Guangzhou) Co., Ltd., regarding Floor Standing Metal-top Ironing Tables from the People's Republic of China case Brief ("Since Hardware Case Brief").

[8] Since Hardware cites the preliminary results of the instant review, and *Fresh Garlic From the People's Republic of China:  Final Results of Antidumping Duty New Shipper Review*, 67 FR 72139 (December 4, 2002), and accompanying Issues and Decision Memorandum at Comment 6.

[9] *See Floor-standing, Metal-top Ironing Tables and Certain Parts Thereof from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 72 FR 13239 (March 21, 2007) ("*AR1 Final Results*").

[10] *See* Since Hardware's October 1, 2007, Surrogate Value Submission for Final, at exhibit 2.

Hardware argues that when presented with other reliable information on the record of the review, such as the Delite Kom financial statements, the Department should use the more complete and contemporaneous financial statements. In the instant case, Since Hardware argues that the Delite Kom financial statements are more contemporaneous to the instant POR than are the 2004–2005 Infiniti Modules financial statements. *See* Since Hardware Case Brief at 1–4.

Petitioner rebuts[11] Since Hardware's claims and argues that Delite Kom may be engaged in distributing or reselling and thus its financial statements include earnings and expenses that are not associated with the production of comparable merchandise. Petitioner argues that it is the Department's practice to exclude expenses that are not associated with the production of the comparable merchandise, citing the Department's treatment of the Godrej & Boyce Mfg. Co. Ltd. ("Godrej") financial statements in the preliminary results of the instant segment, and the Department's decision in *Dorbest Ltd. v. United States*, 30 CIT __, Slip Op. 06–160 (2006) ("*Wooden Bedroom Furniture Remand*"). Petitioner argues that quantitatively, the distortion from Delite Kom's other business practices creates a larger distortion than the distortion from the Godrej financial statements, and therefore the Department should similarly disregard the Delite Kom financial statements.

Furthermore, petitioner argues that the lack of schedules regarding the "other income" and "turnover" does not allow the Department to discern income associated with Delite Kom's other business practices, and therefore cannot accurately segregate expenses associated with the manufacturing of comparable merchandise. Moreover, petitioner argues that the information contained in the Delite Kom financial statements regarding the company's public deposits is internally inconsistent and therefore the Delite Kom financial statements are not an appropriate basis for the Department to base its surrogate financial ratios when a more reliable and contemporaneous source exists in the 2005–2006 Infiniti Modules financial statements. *See* Petitioner's Rebuttal Brief at 3–8.

**Department's Position:**

Pursuant to section 773(c)(1) of the Act, it is the Department's practice to use the best available information to derive the surrogate financial ratios. To determine the best available information, the Department considers several factors, including the quality, specificity, and contemporaneity of the source information.[12] For these final results, the Department has determined that the 2004–2005 Infiniti Modules financial statements are the best available information on the record of this review from which to derive surrogate financial ratios.

---

[11] See October 16, 2007, letter to the United States Department of Commerce, from Blank Rome on behalf of Home Products International, Inc., regarding Floor-standing, Metal-top Ironing Tables and Certain Parts Thereof from the People's Republic of China, Rebuttal Brief of Home Products International, Inc. ("Petitioner's Rebuttal Brief").

[12] *See, e.g., Fresh Garlic from the People's Republic of China:  Final Results of Antidumping Duty New Shipper Review*, 67 FR 72139 (December 4, 2002), and accompanying Issues and Decision Memorandum at Comment 6.

Infiniti Modules:

The Department disagrees with petitioner that the audited 2005–2006 Infiniti Modules financial statements represent a comparatively better source than the complete and audited, but less-contemporaneous, 2004–2005 Infiniti Modules financial statements.  The Department notes that while the contemporaneous 2005–2006 Infiniti Modules financial statement sub-schedules and "balance sheet abstract" provide much of the necessary information used by the Department to calculate the surrogate financial ratios, the P&L statement is not publicly available and remains absent from the financial statement on the record of the instant review.

While the missing P&L statement alone may not be dispositive, the Department agrees with Since Hardware that the proprietary nature of the statement suggests that there may be information on the P&L statements that is not reported in the supporting schedules, and thus raises concerns as to whether the portions of the 2005–2006 financial statement on the record provide the Department with all the necessary information.[13]  The P&L (or income statement) is internationally recognized as one of three major financial statements included in a financial report, and is used to report all revenues and expenses over a period of time.  The P&L statement typically provides an itemization of all aggregated revenues and expenses, but certain incomes and expenses listed on the P&L statement often may not have supporting schedules, as recognized by petitioner in its rebuttal comments regarding the Delite Kom financial statements.[14]  Thus, without the P&L statement for the 2005–2006 Infiniti Modules financial statements, the Department is unable to confirm whether all revenues/expenses associated with the production of the comparable merchandise have been properly included in the surrogate financial ratio.

Furthermore, in allocating incomes and expenses for the purpose of deriving the surrogate financial ratios, it is the Department's standard practice to reconcile all of the company's revenues and costs (irrespective of its relationship to the subject merchandise), such that the total of the reported income statement amounts sum to (approximately) zero, allowing only for minor

---

[13] The Department notes that under Indian Law, Infiniti Modules may not have been required to publicly release its P&L statement.  However, the Indian legal provisions to which petitioner cites do not prevent Infiniti Modules from releasing its P&L statement.  The fact that Infiniti Modules did not release its P&L statement raises concerns that items listed on its P&L statement which may be relevant to the surrogate financial ratio calculation are not listed in the publicly available schedules.

[14] See July 27, 2007, Letter from Home Products International, Inc.; To the United States Department of Commerce; Regarding Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from China:  Information for Valuation of Factors of Production, at footnote 2:  "Derivation of the remainder of Delite Kom's revenue is not readily apparent.  The P&L lists Other Income of Rs. 218,290.05, the details of which are not disclosed elsewhere in the financial report, although the Directors' Report recognizes as 'Turnover' the sum of the P&L amounts for Turnover and Other Income; 'Turnover' (taken from schedule 12) is not detailed."  See also ibid, at page 7:  "We have already noted (n.2 supra) the fact that the 'Other Income' amount shown in the Delite Kom P&L statement is not detailed in the supporting schedules…".

rounding errors.[15]  The Department notes, however, that based on petitioner's allocation of the reconstructed financial statements from the 2005–2006 Infiniti Modules sub-schedules,[16] the total income figure (profits including revenue) exceeds the total expenses by several hundred rupees, further suggesting that the P&L statement may contain non-public, yet relevant information to the Department's calculation.  While the discrepancy of several hundred rupees may seem relatively small, the magnitude of the discrepancy suggests that it is not due merely to a rounding error, and thus, suggests that there may be potential revenues and expenses on the P&L statement that were not reported in supporting sub-schedules.  Specifically, although the figure appears relatively small, the Department finds that it could represent a "netted" amount of undisclosed revenues and expenses that were reported on the P&L statement, and not detailed in sub-schedules.  As such, the P&L statement is vitally important to the Department's analysis, because the Department must assess the level to which the information contained in the financial statement includes income and expenses not associated with the production of the comparable merchandise.  Without the P&L statement, the Department is unable to conduct this analysis or corroborate the completeness of the income and expenses reported in the financial reports sub-schedules.  In contrast, because the 2004–2005 Infiniti Modules financial statements on the record include a P&L statement, the Department is able to analyze and corroborate all of the income and expenses listed on the P&L statement and can accurately allocate all incomes and expenses accordingly.

We note that petitioner is correct that in other reviews, the Department has occasionally relied upon incomplete financial statements to derive surrogate financial ratios.  However, the Act requires the Department to determine the surrogate financial ratios based on the best available information on the record.  *See* section 773(c)(1) of the Act.  Thus, the Department evaluates the best available surrogate information on a case by case basis, and in each case, the Department must evaluate among the surrogate value sources placed on the record to determine which constitutes the most comparable, and accurate information.  Thus, the lack of the P&L statement from the financial report may not always invalidate the financial statement as a potential surrogate source if no more reliable options are available.  In this case, however, the Department finds, for the reasons discussed above, that in comparing the 2005–2006 Infiniti Modules with the more complete 2004–2005 Infiniti Modules financial statements, the 2004–2005 Infiniti Modules financial statements are wholly publicly available and thus more reliable and complete.

---

[15] *See* Memorandum to the File; From Anya Naschak, Senior International Trade Compliance Analyst, and Bobby Wong, International Trade Compliance Analyst; Through James C. Doyle, Office Director; Regarding Antidumping Duty Second Administrative Review of Floor-Standing, Metal-Top Ironing Tables, and Certain Parts Thereof from the People's Republic of China:  Factors of Production Valuation for the Preliminary Results; at Attachment 9—the Department's allocation of Infiniti Modules 2004–2005 financial statements, where the (rounding) error of the sum of the "income statements amount" equals 1 (one) rupee.

[16] *See ibid*, at exhibit 2.

Using similar logic and consistent with the previous review of the Ironing Tables antidumping order, the Department finds that Agew Steel's 2004-2005 financial statements do not represent the best available information on which to calculate Since Hardware's surrogate financial ratio. *See AR1 Final Results* and accompanying Issues and Decision Memorandum at Comment 1. Irrespective of the comparability of the merchandise produced by Agew Steel, the financial statements are materially incomplete because they lack a P&L statement. Thus, the reasons discussed above for rejecting Infiniti Modules 2005-2006 financial statements because they lacked a P&L statement are equally applicable to Agew Steel's 2004-2005 financial statements.

Delite Kom:

The Department agrees that Delite Kom is a producer of comparable merchandise, as Delite Kom produces similar merchandise to Infiniti Modules, which the Department previously found to be comparable to ironing tables (*e.g.*, steel furniture). *See AR1 Final Results* and accompanying Issues and Decision Memorandum at Comment 1. However, the Department disagrees that the Delite Kom financial statements should be used in calculating Since Hardware's surrogate financial ratio. Since Hardware argues, based on Delite Kom's primary materials consumed, that Delite Kom's experience and production processes are more comparable to Since Hardware's experience and production processes than Infiniti Modules's. The Department disagrees. Primary material inputs are not necessarily indicative of a company's experience and/or production processes and Since Hardware has not evidenced that Delite Kom's experience and production processes are, in fact, more similar to Since Hardware's. It is the Department's practice to evaluate the comparability of surrogate producers based on the similarity of the manufactured finished good and not the comparability of inputs to production. The similarity in the raw materials consumed may bear little relation to the comparability of the final products to subject merchandise. Furthermore, the Department finds no evidence on the record of the review that Delite Kom's production process is demonstrably more similar to Since Hardware than Infiniti Modules' production process. Based on the manufactured finished goods produced by Delite Kom, the Department finds that Delite Kom does produce merchandise that is comparable to ironing tables; however, there is no evidence that Delite Kom's experience and production processes are more similar to Since Hardware's.

Furthermore, the Department notes that the financial statements provide insufficient detail regarding income and expenses line items that may be relevant to the Department's analysis. As identified by petitioner in its case brief, the 2005–2006 Delite Kom financial statement reports "other incomes," but does not have a corresponding sub-schedule to describe the nature of the line item, and the sub-schedule for "turnover" does not provide a description or disaggregation of the nature of the revenue. *See* Footnote 14 above. Furthermore, the Department notes that in schedule 20, "Accounting Policies & Notes to Accounts for the Year Ending March 31, 2006," under part two (ii) of "Revenue Recognition," the company's "Job Works" includes "Other

Incomes."  This may suggest that an indiscernible amount of revenues earned from "Job Work" may be included in the company's reported "Turnover" and "Other Income."  Without further detail, the Department is unable to determine the extent to which "Job -Works" impacts the reporting of the company's overall revenue and expenses.  In comparison, the Department notes that the P&L statement of the 2004–2005 Infiniti Modules financial statements identifies the revenues and expenses associated to "Job-Work."  This allows the Department to observe and assess the extent of any distortions to the surrogate financial ratios from the non-comparable side, such as "Job-Work," of Infiniti Modules' business.

The Department also notes that Delite Kom incurred significant expenses for the purchase of "trading goods," accounting for a quarter of the company's total annual expenses.[17]  Based on the magnitude of the expense (second largest), it appears that Delite Kom's "trading goods" expense may comprise one of the company's primary business activities.  Additionally, any revenues earned from "trading goods" appear to be aggregated in the company's reported "turnover," as no further detail regarding revenue is provided.  Furthermore, we note that the only notation of the "trading goods" expense in the Delite Kom financial statements is found on the largely illegible and untitled final page of the financial statements.  The chart on this final page lists the purchases of various items that are not comparable to the subject merchandise (*i.e.* sofa, stool, tables).  This suggests that Delite Kom's second largest business activity, "trading goods" relates to non-comparable merchandise.  In addition, the financial statement does not provide details regarding the purpose or disposition of the "purchased" merchandise.  Instead, the final page only accounts for the opening and closing stock of this "purchased" merchandise.  Absent any further description of the "trading goods" expense and its relationship to revenue, and without a segregation of its costs from each of the other expense line items, the Department is unable to determine the possible effect of the "trading goods" expense on the company's total expenses, which could potentially distort the Department's surrogate calculation of overhead, profit, and SG&A.  For example, the Department is unable to determine whether the revenues associated with "trading goods" were included in turnover, or whether the costs associated with the purchase of "trading goods" were integrated into the reported expenses for Delite Kom's "Cost of Materials Consumed," "Manufacturing," "Administrative," or "Selling & Distribution." Because the trading goods expense represents a quarter of Delite Kom's total expenses, and appears unrelated to the manufacture or sale of comparable merchandise, the Department finds that the Delite Kom financial statements are not the most appropriate surrogate source for the Department's calculations.  Furthermore, given the obscurity surrounding Delite Kom's "trading" business activities, the Department is unable to discern the extend of Delite Kom's comparable business, notwithstanding the Department's recognition of Delite Kom as a producer of comparable merchandise.

---

[17] *See* October 1, 2007, Letter from Since Hardware; To the United States Department of Commerce; Regarding Floor-standing, Metal-top Ironing Tables from the People's Republic of China, at exhibit 1.

The ambiguity in Delite Kom's financial statement regarding "trading goods," other incomes, turn-over, and job-work is not present in the 2004–2005 Infiniti Modules financial statements. For all the reasons discussed above, the Department finds that the 2004–2005 Infiniti Modules financial statements are the best available information on which to calculate surrogate financial ratios under section 773(c)(1) of the Act.

## Comment 2:   Appropriate Allocation of "Carriage Inward" Expense

Since Hardware argues that, should the Department use the 2004–2005 Infiniti Modules financial statements, the Department must properly include the "Carriage Inward" expense in the cost of raw materials ("COM") in calculating the surrogate financial ratios.  Since Hardware cites the *Final Determination of Sales at Less Than Fair Value:  Honey from the People's Republic of China*, 66 FR 50608 (October 4, 2001) ("*Honey from the PRC*") and accompanying Issues and Decision memorandum at 7, and argues that the freight-in expense should be classified as a material expense.[18]  *See* Since Hardware Case Brief at 4–6.

Petitioner rebuts Since Hardware's claim, arguing that the Department would understate overhead, SG&A, and profit amounts if it included freight-in expenses in the surrogate financial ratio calculation.  Petitioner argues that the Department can only include the freight-in expense in the surrogate financial ratio to the extent that it can be equalized with freight-in in the NME market.  Because the information to equalize these expenses is unavailable, petitioner contends that the Department cannot include them in the surrogate financial ratio.

In addition, Petitioner cites to *Sigma Corp. v. United States*, 117 F.3d 1401 (Court of Appeals Federal Circuit ("CAFC") 1997) ("*Sigma*") to support its position arguing that the Federal Circuit found that it would be an overstatement to apply full surrogate domestic freight to surrogate values of materials based on import values.  Petitioner reasons that it would be a corresponding understatement to dilute the financial ratios by including full surrogate domestic freight in the denominator of the surrogate value financial ratio.  Specifically, Petitioner argues that such an inclusion of domestic freight in the surrogate financial ratio is premised on an erroneous assumption invalidated by the Federal Circuit in Sigma—that a surrogate producer would choose to pay the highest combination of prices for materials plus freight.  Furthermore, Petitioner argues that the Normal Value calculation engages in the fiction that the NME producer would acquire materials at the closer of the domestic supplier's factory or the nearest seaport.  Thus, petitioner contends, at most, only that portion of the surrogate producer's domestic freight

---

[18] Since Hardware also cites *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China*, 63 FR 63842, 63855–63856 (November 17, 1998) and accompanying Issues and Decision Memorandum at Comment 23; and *Mushrooms from the People's Republic of China*, 72 FR 44827, 44829 (August 9, 2007).

that would apply to the transfer of imported materials (if any) from the port to the surrogate producer's factory could justifiably be included to achieve parity with the surrogate-valued materials in the Normal Value calculation.  Otherwise, petitioner argues, the financial ratio calculation gives no credit for the surrogate producer's use of imports or of materials otherwise acquired on any delivered terms, for which, freight costs are in the materials costs (as in the surrogate value of the NME producer's materials) not in the reported freight expense.  Petitioner concludes that it is entirely appropriate for the Department to disregard the comparable merchandise producer's freight-in when compiling the denominator of the financial ratios so as not to overstate the freight-burden relative to that of the NME producer's surrogate value materials.

**Department's Position:**

The Department agrees with Since Hardware that it should include clearly identifiable inward transportation expenses in the cost of raw materials included in Since Hardware's surrogate financial ratios.  The record evidences that, in the Infiniti Modules 2004-2005 financial statements, the company bifurcated transportation expenses between inward and outward transportation expenses.  Inward transportation expenses relate to manufacturing.  *See* April 19, 2007, letter from Home Products International, Inc., to the Department, Regarding Surrogate Value Information Concerning Financial Ratios (Factory Overhead, SG&A Expense and Profit) at Exhibit 2.  As such, it is the Department's practice to include inward transportation expenses in the COM included in the surrogate financial ratio.  *See*, *e.g.*, *Folding Metal Tables and Chairs from the People's Republic of China: Final Results of Antidumping Administrative Review*, 72 FR 71355 (December 18, 2007) and accompanying Issues and Decision Memorandum at Comment 2.  In addition, the inclusion of inward transportation expenses to the cost of manufacturing calculation, used in the denominator of the financial ratios calculation, achieves greater parity between the COM used in the surrogate financial ratio calculation and the COM embedded in the normal value calculation because the Department's general practice is to include transportation costs in the normal value calculation.

The Department disagrees with petitioner's argument that the Department should exclude inward transportation costs.  The petitioner argues that some of the comparable producer's input prices could include transportation costs and therefore the Department should not include these expenses.  However, petitioner's speculation is unsupported by the record evidence, which shows that Infiniti Modules expressly broke out such expenses.  Moreover, petitioner's argument highlights the imprecise nature of the surrogate value calculation.[19]  With regard to transportation expenses, this imprecision exists because these expenses are not itemized on an input-specific

---

[19] *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1381 (CAFC 2001) (The process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise.).

basis in financial statements, including in Infiniti Modules 2004-2005 financial statements. Thus, given the inherent imprecision and the evidence supporting that Infiniti Modules reported inland freight separately from materials by listing it separately, the decision to include these transportation costs is squarely within the Department's discretion. The Petitioner explicitly acknowledges this discretion in its rebuttal brief. See Petitioner's Rebuttal Brief at 10. For the reasons discussed above, the Department has decided to include inward transportation costs in the denominator of the surrogate financial ratio calculation.

Finally, the Department also rejects Petitioner's argument that *Sigma* requires the Department to exclude the inward transportation expenses from the surrogate financial ratio calculation. *Sigma* did not relate to the inclusion of transportation costs in the calculation of surrogate financial ratios. Rather, the court analyzed the addition of a constructed transportation cost to surrogate values as part of the normal value calculation (or in the terms of the Act at the time of *Sigma*, the "fair market value" calculation). *Sigma*, 117 F.3d at 1407-08. In addition, the facts of that case are clearly distinguishable from the instant review. In *Sigma*, the facts evidenced that the inclusion of the constructed transportation costs resulted in double-counting. *Id*. In the instant review, the Petitioner has not evidenced any actual double-counting or other distortions but, instead, relies on the theoretical possibility that distortions could result from the inclusion of inward transportation costs in the financial expense ratio.

For all these reasons, the Department has included Infiniti Modules freight-in expenses in the calculation of the denominator used to determine Since Hardware's surrogate financial ratios.

## Comment 3:   Application of Benchmark Analysis

In its case Brief, Since Hardware argues that the Department's decision to disregard the prices paid by Since Hardware for market economy ("ME") supplied inputs is not supported by record evidence. Since Hardware notes that, according to the section 773(c)(1) of the Act, 19 USC 1677b(c)(1), and *Shandong Huarong General Corp. v. United States*, 159 F. Supp. 2d 714 (CIT 2001), the Department must use the best available information to determine normal value. Furthermore, Since Hardware notes that according to 19 CFR 351.408(c)(1); the *Final Determination of Sales at Less Than Fair Value:  Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 FR 55271, 55274–75 (October 25, 1991); and the *Preamble* to the Department's regulations, the Department is to use the price paid for a meaningful volume of inputs purchased at arm's-length from a ME supplier to value the identical inputs purchased from non-market economy ("NME") suppliers.[20]

---

[20] *Citing Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27366 (May 19, 1977) ("*AD Final Rule*"); and *Shakeproof Assembly Components, Div. of Illinois Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

Since Hardware argues that, while the Department has an established practice of disregarding ME purchase prices under certain circumstances (*e.g.*, affiliation between the input supplier and producer; the purchases of inputs were not at arm's length; the input purchases were dumped or subsidized; the inputs were not used in the production of subject merchandise during the POR; or the ME sourced inputs were produced within an NME),[21] none of those circumstances are present in the instant review.  Rather, citing *Market Economy Inputs Practice in Antidumping Proceedings Involving Non-market Economy Countries*, 71 FR 4176, 14178 (March 21, 2006), Since Hardware argues that, unless an exception is predicated on specific factual findings, the Department is to use the ME price paid to value inputs sourced from NME suppliers.  *See* Since Hardware Case Brief at 7–9.

Since Hardware argues that, in the instant review, there is no evidence on the record that undermines the validity of the prices paid for inputs from its ME supplier.  Additionally, Since Hardware argues that the Department's basis for testing the ME supplier's prices—location of its owners in an NME—does not constitute substantial evidence that the prices paid by Since Hardware were not legitimate market values.  Furthermore, Since Hardware argues that the Department never defined "market" or "non-market principles" or how they may be quantifiably different.  Next, Since Hardware argues that the Department cannot base methodological changes on merely potential pricing practices as the Department did in the *Preliminary Results*.[22]  Since Hardware concludes that, without record evidence, the Department has not provided an adequate basis for its conclusions, and thus has no basis to depart from its normal methodology.  Therefore, Since Hardware argues that the Department should use its reported ME prices to value its inputs.  *See* Since Hardware Case Brief at 9–12.

Petitioner rebuts Since Hardware's claims and argues that, given the ownership of Since Hardware's input supplier, the Department was justified in scrutinizing this input supplier's prices under 19 U.S.C. 1677(33).[23]  In support of this argument, petitioner cites to *Polyethylene*

---

[21] *See China National Machinery Import & Export Corporation v. United States*, 293 F. Supp. 2d 1334 (CIT 2003) as *affirmed per curiam* 04 Fed. Appx. 183 (Federal Circuit, July 9, 2004); *Final Determination of Sales at Less Than Fair Value:  Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 FR 71005 (December 8, 2004) and accompanying Issues and Decision Memorandum at Comment 8; *Final Determination of Sales at Less Than Fair Value:  Polyethylene Retail Carrier Bags from the People's Republic of China*, 69 FR 34125 (June 18, 2004) and accompanying Issues and Decision Memorandum at Comment 4.

[22] *See AD Final Rule*; and *Smith-Corona Group v. United States*, 713 F.2d 1568, 1581 (CAFC 1983).

[23] 19 U.S.C. 1677(33) states: Affiliated persons. The following persons shall be considered to be "affiliated" or "affiliated persons": (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants. (B) Any officer or director of an organization and such organization. (C) Partners. (D) Employer and employee.  (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.  (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person. (G) Any person who controls any other person and such person.
For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

*Retail Carrier Bags Committee v. United States*, 29 CIT __, Slip Op. 05-157 at 47 (2005),[24] where the CIT affirmed that prices or products that originate in a NME country should not be used because of the inherent distortions involved in an economy that is not controlled by market forces.  Petitioner argues that the ownership of Since Hardware's input supplier provides the "flip side" of this situation.  That is, prices set by a vendor controlled by an entity that is in an economy not controlled by market forces necessarily are subject to inherent distortions.  *See* Petitioner's Rebuttal Brief at 11–13.

Petitioner notes approvingly that the purpose of the Department's benchmark test[25] was to consider whether Since Hardware's input supplier made sales based on market principles. However, Petitioner argues that, in contrast to the benchmark methodology applied in the previous segment of the review, the Department separately assessed inputs based on material specifications and the country of export in the *Preliminary Results*.  Petitioner argues that this methodology leads to absurd results, as the Department found that Since Hardware's input supplier sold some cold-rolled steel under market principles while other sales of cold-rolled steel failed to adhere to market principles.

Petitioner further argues that the Department should use the benchmark methodology established in the previous segment to test whether inputs were purchased within market conditions. Petitioner notes that through the test the Department assessed all of Since Hardware's acquisition of cold-rolled steel from the ME input supplier regardless of the origin.  Alternatively, petitioner argues the Department should employ the weighted-average benchmarking methodology used in part in the *Preliminary Results* for all of Since Hardware's cold-rolled inputs.  Petitioner concludes that under either alternative, cold-rolled steel would fail the Department's benchmark. *See* HPI Case Brief at 18–24.  In addition, petitioner argues that, as in the prior segment, the Department should exclude all export sales into NME countries from the export sales on which the benchmark is based.

Next, citing to *Polyethylene Retail Carrier Bag Committee v. United States,* 29 CIT __, Slip Op. 05-157 at 48 (2005), petitioner argues that the Department's departure from its previously established methodology without explanation or justification in the instant review is unlawful. Petitioner argues that there are no statutory or regulatory[26] provisions to warrant establishing a "market-economy threshold" regarding purchases of inputs in NME cases.[27]  Furthermore,

---

[24] *See Polyethylene Retail Carrier Bags from the People's Republic of China*, 69 FR 3425 (June 18, 2004) and accompanying Issues and Decision Memorandum at Comment 4.
[25] *See Viraj Forgings, Ltd. V. United States*, 28 CIT __, 350 F. Supp. 2d 1316, 1320 (2004).
[26] *See* Section 773(a)(1)(B)(ii) of the 1930 Tariff Act ("the Act"), and 19 CFR 351.408(c)(1) of the Department's Regulations.
[27] *See* August 31, 2007, memorandum to the File; from Bobby Wong, International Trade Analyst; through Scot T. Fullerton, Program Manager; regarding the Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") Analysis

petitioner argues that in applying the benchmark, the Department's objective is to assess whether Since Hardware's input supplier sold to Since Hardware using ME principles, and not whether some of the sale prices passed a benchmark.

Petitioner goes on to argue that the benchmark values are materially understated such that the benchmark test is inherently biased toward accepting the input supplier's reported sale prices. Petitioner notes that the export prices published by the World Trade Atlas ("WTA") are understated because the terms of the sales underlying these statistics are less expensive than Since Hardware's terms of sale from the input supplier.  Furthermore, petitioner argues that the WTA export prices also exclude other normal expenses that are necessary for a fair comparison. Petitioner concludes that because the Department's revised benchmark comparison is unreasonable, based on the record evidence, the Department should value all of Since Hardware's cold-rolled steel inputs using Indian surrogate values.  *See* HPI Case Brief at 29–30.

In its rebuttal brief, Since Hardware argues that the Department had no basis to scrutinize Since Hardware's ME purchases.  However, Since Hardware states that if the Department is going to employ a benchmark, it agrees with petitioner that the Department's benchmark methodology arbitrarily designates a price upon which to assess Since Hardware's input supplier's prices. Since Hardware argues that the Department's benchmark methodology was developed to determine whether the entity (*i.e.*, the input supplier) acted under market principles.  Since Hardware cites *Fujian Machinery and Equipment Import & Export Corporation v. United States*, 25 CIT 1150, 1156, 178 F. Supp. 2d 1305, 1314 (2201) and argues that in general, the Department's benchmark methodology confirms that, taken as a whole, Since Hardware's supplier acted under market principles because all of the input supplier's hot-rolled steel and approximately half of the cold-rolled steel passed the benchmark.  Since Hardware argues that the Department's benchmark test led to the inconsistent conclusion that in one instance the Hong Kong input supplier employed ME principles in setting prices to Since Hardware, and in the other, the same supplier employed NME principles.  Since Hardware concludes that these inconsistent results illustrate that the Department's interpretation and application of the WTA export data are arbitrary and not supported by substantial evidence and are thus unlawful.

Since Hardware rebuts petitioner's argument that there is a cost bias based on shipment terms inherent in the benchmarking test by arguing that petitioner's argument is premised on a level of precision in the export statistics and the benchmarking analysis that simply does not exist.  Since Hardware concludes that petitioner's assertion that the WTA export values are expressed on an FOB basis is of little relevance to the Department's benchmarking analysis because the export data can only be considered a relevant benchmark in the most general sense.

---

Memorandum for the Preliminary Results:  Second Antidumping Administrative Review of Floor-standing, Metal-top Ironing Tables and Certain Parts Thereof from the People's Republic of China ("PRC").

Since Hardware states that the Department's benchmark methodology is arbitrary, conceptually flawed, imprecise, and its results are inconsistent and unsupportable. Since Hardware argues, however, that, should the Department continue to use a benchmark, it should revise the methodology to use a range of export prices, which would lead to the conclusion that Since Hardware's supplier based its sales on market principles, and should therefore use the reported purchase prices for the final results. *See* Since Hardware's Rebuttal Brief at 3–6.

Since Hardware additionally claims that the Department's benchmark determination in the preliminary results was unreasonable because it employed a bright-line test that lead to an illogical conclusion. Since Hardware asserts that the Department based its methodology on the unsupportable assumption that the average export price within an HTS category can distinguish between a company's pricing decisions based on ME principles and those based on NME principles. Since Hardware argues that, based on the Department's methodology and assumptions, a ME may export some materials to countries under ME principles, while exporting the same material to countries under NME principles, depending upon whether the price fall above or below the Department's benchmark. Since Hardware concludes that taken to its logical conclusion the Department's test leads to the astounding result that half of all world exports are made under ME principles and half are not.

Since Hardware asserts that in employing the benchmark test the Department ignored the wide range of market specific export prices for each of the inputs the Department tested. Since Hardware contends that this wide range is not surprising given the Department employed broad basket HTS categories. Since Hardware asserts that a broader analysis of the WTA export statistics—one that takes into account the full range of prices rather than a simple average prices—demonstrates that the input supplier based its pricing decisions on ME principles. Since Hardware concludes that the Department's preliminary decision is not supported by substantial evidence because it has not considered the range of prices for each input and, thus, ignored the fact that Since Hardware's purchase price from its supplier fell well within the range of average export pricing data that the Department collected. In support, Since Hardware cites to *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983), quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951), arguing Commerce must consider all the evidence on the record, including the evidence opposed to its view. *See* Since Hardware Case Brief at 12–16.

Petitioner rebuts Since Hardware's claims and argues that despite respondent's complaints, the Department's conservative benchmark methodology is biased in Since Hardware's favor. Furthermore, petitioner argues that, despite the Department's conservative approach, the results indicate that Since Hardware purchased various inputs from its ME supplier at prices that are not representative of market principles. Petitioner claims that, in general terms, the Department's benchmarking test considers ME principles consistently with 19 U.S.C 1677(18)(A) because this

test considers Since Hardware's supplier's cost and pricing structures indicated markup and resale to Since Hardware at prices above those at which the inputs are available on the international market.

Petitioner argues that it is irrelevant whether destination-country-specific average values fall above or below the benchmark value, but rather the relevant question is whether the input supplier adhered to market principles by reselling the materials at prices above which the ME-produced product is available to that supplier on the international market.  Petitioner contends that by using the export price as an indicator without accounting for resale profit, the Department actually biased the benchmark in favor of Since Hardware.  Regardless, petitioner argues that the Department's methodology is a reasonable approximation of international market values from source country.

Furthermore, petitioner rebuts Since Hardware's claim and argues that even using country-specific export price averages to Hong Kong as suggested by the respondent, the purchase price of steel springs, bolts, and rivets would continue to indicate that the prices paid did not adhere to market principles.  In addition, petitioner argues that if the Department made the necessary cost adjustments to the benchmark methodology to reflect the proper sale terms and reseller markup, nails would also fail this country-specific export price version of the benchmark test.  *See* Petitioner's Rebuttal Brief at 13–17.

**Department's Position:**

While the Department's normal practice pursuant to Section 773(c) of the Act and 19 CFR 351.408(c)(1) is to accept input prices to value the factors of production when the input is purchased from an ME supplier and paid for in a ME currency, neither these legal provisions nor the Department's practice explicitly limit the circumstances in which the Department may reject input prices and instead rely on surrogate values.  The Department continues to find that the circumstances surrounding the sales of certain inputs to Since Hardware from its Hong Kong supplier raise significant concerns regarding whether the Hong Kong supplier, when selling to Since Hardware, was in fact acting in accordance with ME principles.  During the verification of Since Hardware in the previous segment of this proceeding, the Department discovered that the Hong Kong trading company, which supplied Since Hardware with various raw materials, was majority owned by a Chinese entity.  *See AR1 Final Results.*  No evidence has been presented in this review to suggest that this ownership relationship has changed.  In this regard, the Department's decision to employ the benchmark analysis is based on the facts before the Department and not, as Since Hardware argues, based on mere possibilities.

With respect to respondent's argument that the location of the owners of a ME company does not constitute substantial evidence that the prices paid by Since Hardware were made under NME principles, we note that, as articulated in *AR1 Final Results,* we continue to have concerns over

the potential for price manipulation by a trading company physically located in a ME but overwhelmingly owned by an entity located in an NME.  *Id.*  An owner may be in a position to influence the decisions of a company, including the company's pricing decisions.  These concerns led the Department to establish a methodology to determine whether Since Hardware's Hong Kong supplier of production inputs made pricing decisions based on NME or ME principles.  For these final results, because Since Hardware continued to purchase and consume a considerable quantity of its material inputs from the same Hong Kong trading company during the POR, the Department remains concerned over the potential for price manipulation, and has continued to apply the benchmark analysis.

With respect to petitioner's argument that the Department should adjust the benchmark because the WTA prices create an inherently understated benchmark that is biased toward respondent, we disagree.  Petitioner has claimed that the shipment terms reported by WTA are less expensive than the shipment terms reported by the Hong Kong trading company.  The Department finds, however, that it would be impracticable and exceedingly difficult, if not impossible, based on the information on record of the instant review, to accurately adjust the benchmark calculation to account for all the possible price differences between the WTA shipment terms and those of the Hong Kong trading company.  Moreover, this argument erroneously assumes a level of precision in the Department's benchmarking analysis that does not exist.  As recognized by the CAFC in *Shakeproof*,[28] the process of constructing foreign market value (or "normal value") for a producer in an NME is difficult and necessarily imprecise.  We note that, while the Department's current benchmark utilizes the best information, this analysis attempts to model the behavior of a non-respondent company, and thus, the benchmark analysis is inherently imprecise.  Furthermore, as the benchmark analysis is an approximation based on averages, any detailed adjustments to the calculation may simply lead to false accuracy.  In conclusion, the Department finds that no evidence exists on the record of the instant review which suggests that the specific adjustments which were recommended by either petitioner or respondent would in fact increase the precision or accuracy of the Department's current methodology.  (However, as discussed below, one adjustment to the benchmark is necessary due to an inadvertent error in the *Preliminary Results*.)

With respect to respondent's argument that the use of a "bright-line" test is unreasonable, we disagree.  In attempting to discern whether the Hong Kong trading company engaged in NME pricing practices for inputs sold to Since Hardware, the Department used export statistics obtained from the WTA and applied the corresponding HTS categories from the countries that originally produced the inputs.  The Department then calculated a weighted-average value for export prices for each HTS based on the country in which the input was originally produced.

---

[28] *Shakeproof Assembly Components, Div. of Illinois Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

Next, the Department applied the weighted-average price as a representative benchmark to examine whether Since Hardware purchased inputs from its Hong Kong supplier under ME principles.  As noted above, although we acknowledge that the benchmark methodology employed may be necessarily imprecise, we continue to find that the benchmark as applied in the *Preliminary Results* is reasonable, as the HTS specific, weighted-average prices incorporate a broad range of prices representing various specifications and qualities.  The Department disagrees with Since Hardware that establishing a range of prices would provide a better benchmark for each input.  Because HTS categories sometimes include aberrational values and outliers, it would be exceedingly difficult to determine the appropriate range to be used; moreover, the weighted average approach employed by the Department eliminates or greatly reduces the distortive effect of any such outliers or aberrational values, thus resulting in a more meaningful analysis than the analysis resulting from an arbitrarily set range of values.  Therefore, the Department finds that the weighted-average prices for each HTS category serve as a reasonable representation of ME prices and may properly be used to determine whether the Hong Kong trading company sold its merchandise using ME principles.

As noted above, petitioners and respondents have further objected to the Department's decision in the *Preliminary Results* to revise the benchmark methodology from the *AR1 Final Results* by examining the prices of inputs on a country-specific basis.  The Department finds that this country-specific comparison is more consistent with the Department's practice in valuing raw material inputs purchased from market economies and thus provides a better benchmark analysis.  Furthermore, it allows for a better correlation between the benchmark and the Hong Kong reseller's sale prices.  Because the market conditions of each ME country are independent of one another, we find that averaging the prices of inputs produced by more than one ME country would dilute the specificity of the benchmarking test, and thus we have determined that a benchmark linked to the source of supply is more appropriate.  We note, however, with respect to petitioner's argument that, in the preliminary results the Department's benchmark resulted in the "absurd" finding that the Hong Kong supplier sold some cold-rolled steel under ME principles while it made other sales of cold-rolled steel under NME principles, based on the revised benchmark analysis detailed below, the disparate results no longer exist and thus the specific argument with respect to cold-rolled steel is moot.

With respect to petitioner's argument that, consistent with *AR1 Final Results*, the Department should exclude export sales into NME countries from the sales on which the benchmark is based, we agree with petitioner.  The Department inadvertently failed to remove these export sales into NME countries from the benchmark analysis for the *Preliminary Results.*  Similar to the Department's position in OCTG,[29] the Department finds that export sales into NME countries

---

[29] *See Oil Country Tubular Goods ("OCTG"), Other Than Drill Pipe, from Korea:  Final Results of Antidumping Duty Administrative Review,* 71 FR 13091 and accompanying Issues and Decision Memorandum at Comment

may not be determined on ME principles.  *Id.* Thus, it would be improper to include these sales in a test determining whether sales were made based on ME principles.  For these final results, the Department has revised its benchmark analysis to exclude export sales into NME countries from the analysis.  Furthermore, because the aforementioned revision resulted in cold-rolled steel prices falling below the benchmark, the Department has applied a surrogate value to value cold-rolled steel for purposes of these final results.  For a detailed discussion of the Department's surrogate value selection of cold-rolled steel, s*ee* March 10, 2008, Memorandum to the File; From Blaine Wiltse, International Trade Compliance Analyst and Bobby Wong, Senior International Trade Compliance Analyst; Regarding Second Antidumping Administrative Review of Floor-standing, Metal-top Ironing Tables and Certain Parts Thereof from the People's Republic of China: Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") Analysis Memorandum for the Final Results.

## Comment 4:  Plywood

Since Hardware argues that the Department inadvertently valued plywood using an incorrect HTS category based on the Department's Factor Valuation Memorandum, and thus should correct the clerical error for the final results.  *See* Since Hardware Case Brief at 6–7.

**Department's Position:**

We agree with Since Hardware.  The Department inadvertently based Since Hardware's surrogate value for plywood on HTS 44121990 rather than the HTS subcategory noted in the Factors Valuation Memorandum, 44121490.  For the final results, the Department revalued plywood based on the correct HTS number.

**RECOMMENDATION:**

Based on our analysis of the comments received, we recommend adopting all of the above changes and positions, and adjusting the margin calculation programs accordingly.  If accepted, we will publish the final results of the review and the final weighted-average dumping margins in the *Federal Register*.

---

"Issue: The use of China, a non-market economy, as the basis for normal value" (March 14, 2006).  *See also, Husteel Company, Ltd. v.  United States,* CIT Court No. 06-00075 (where the Department is currently defending this position before the CIT).

AGREE_____       DISAGREE_____

_____

David M. Spooner

Assistant Secretary

 for Import Administration

_____

Date